**FIFTH DIVISION**
**MERCIER, C. J.,**
**MCFADDEN, P. J., and RICKMAN, P. J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**February 25, 2025**

# In the Court of Appeals of Georgia

A24A1840. REESER v. GLOVER, JR. et al.

RICKMAN, Presiding Judge.

Alexander S. Glover, Jr., Lynn Glover Holloway, Samuel Glover, and the Glover Family Irrevocable Inter Vivos Trust (collectively, "the Glovers"), are creditors of Georgia Mining Ventures, LLC ("GMV"), an insolvent company. Ronald Reeser and his two business partners were managing members of several LLCs, including GMV and its parent company, Natural Resource Management, LLC ("Natural Resource"), and Reeser was primarily responsible for overseeing GMV's day-to-day affairs. Unable to collect on their debt from GMV, the Glovers sued Natural Resource, GMV, Reeser, Reeser's partners, and numerous entities allegedly

owned or controlled by Natural Resource and/or Reeser and his partners.[1] Following a bench trial, the trial court issued an order and judgment in favor of the Glovers on numerous causes of action,[2] but the one at issue in this appeal is the Glovers' claim that, during the time that GMV was insolvent, Reeser and his partners breached their fiduciary duties by diverting funds and authorizing GMV to make preferential payments for the benefit of themselves and other insider entities that they controlled, for pursuits unrelated to GMV, without proper regard for the Glovers, as creditors. Reeser[3] argues that the Glovers lacked standing to bring a claim of breach of fiduciary duties, which he contends should have been brought as a derivative action. He also

---

[1] The original complaint named only GMV, Reeser, and Reeser's two business partners, although following discovery, the Glovers filed an amended complaint and successfully moved to add Natural Resource, Venture Gold, Inc.; Venture Resources, Inc.; E&M Industries, LLC; Stone Kingdom, LLC; Eagle Reclamation, LLC; PDM Gold, LLC; Sweetwater, Inc.; Bald Eagle Partners, LLC; The Eagle Group, LLC; Railroad Valley Mining Company, LLC; and RVMC Partners, LLC.

[2] The trial court ruled in favor of the Glovers for their claims of breach of a promissory note, breach of fiduciary duty, conspiracy to breach fiduciary duty, and violations of the Uniform Voidable Transactions Act (OCGA § 18-2-70 et seq.), and awarded them both compensatory and punitive damages.

[3] The other named defendants did not join in this appeal.

challenges the trial court's award of punitive damages. For the reasons that follow, we find no error and affirm.

The factual history is complex and extensive, although largely irrelevant to this appeal since Reeser is not challenging the trial court's factual findings and the legal issues before us are narrow. A summary of the relevant facts, taken directly from the trial court's order, are as follows.

In 2014, Ronald Reeser and his partners, Mason Drake and Patrick Maher, created Natural Resource as co-equal owners and managers. One of Natural Resource's primary objectives was to pursue mining interests in Colorado, but it was not particularly successful or profit-generating.

In 2016, GMV was created as a subsidiary of Natural Resource to raise money for Natural Resource. Reeser and his partners served as managers for GMV, and Reeser was primarily responsible for overseeing its day-to-day affairs.

Reeser began exploring conservation easement transactions as a way to raise investment funds for Natural Resource.[4] The Glovers owned approximately 1,170

---

[4] In such transactions, investors purchase ownership interests in land that is donated charitably to a qualified entity for conservation purposes. The investors then claim federal tax deductions based on the charitable donations in proportion to the size of their investment.

acres of land in DeKalb County, Alabama ("the Battelle Property"), and in April 2016, Reeser and Alex Glover began discussing a conservation easement that would include a portion of the Glovers' land.

Initially, Reeser raised some money from investors through GMV. Reeser pushed Alex Glover to close quickly on the conservation easement real estate transaction, suggesting that a faster closing would facilitate quick payment to the Glovers.

The transaction, totaling over $3.1 million, closed in June 2016. The Glovers sold the Battelle Property to GMV by exchanging 98% of their interests in the land's holding company, Railroad Valley Mining Company, LLC ("RVMC"), for $50,000 in cash and $2,750,000 in promissory notes payable by GMV to the Glovers. The deal included the sale of two additional smaller parcels of land, for $50,000 in cash and $310,000 in a promissory note payable by GMV. The promissory notes (collectively, the "2016 Promissory Notes"), were due December 21, 2016. The Glovers then collectively held a 2% interest in RVMC, and GMV became a member of RVMC and its new manager.

After the closing, Reeser and his partners shifted their fundraising efforts from GMV to RVMC. They informed potential investors that a minimum raise of $5 million was necessary to close the conservation easement transaction, and that $3.1 million of that would be earmarked for GMV, presumably to pay the 2016 Promissory Notes. They also represented that $750,000 to $1,000,000 would be reserved for a legal defense fund based upon a concern the IRS might challenge the investors' charitable deductions arising from the conservation easement transaction.

By December 2016, Reeser and his partners reached the minimum $5 million raise only after GMV contributed the final $771,500. In late December 2016 and early January 2017, after the raise concluded, Reeser led Alex Glover to believe that payment for the 2016 Promissory Notes was immediately forthcoming; however, just a few days later, Reeser informed Alex Glover that RVMC had "expenses in excess of our funds" and sought an extension for payment of RVMC's debt.[5]

As negotiations were occurring as to how to resolve the debt owed the Glovers, GMV had no significant assets and no meaningful business prospects. Apart from the funds raised just through RVMC, GMV lacked the wherewithal to make any future

---

[5] The trial court determined Reeser was not forthright with Glover about the results of the investment campaign or the expenses of the transaction.

payment to the Glovers. Privately, Reeser and his partners expressed concern about limiting their personal exposure and the exposure of Natural Resource for the debt GMV owed to the Glovers.

On January 27, 2017, the Glovers and GMV agreed to a new payment arrangement. An immediate payment of $1,048,153.67 was made to the Glovers and a note, payable in two installments due in January of 2018 and 2019, was signed for the remaining $2,096,307.34 (the "2017 Promissory Note"). The 2017 Promissory Note restructured the debt owed on the 2016 Promissory Notes.

In January of 2018, GMV defaulted on the 2017 Promissory Note and this litigation ensued. During discovery, the Glovers learned that GMV had not provided them accurate information about the amount of investment funds raised for the conservation easement transaction or its expenses. Reeser and his partners diverted a significant amount of these funds to debts, payments, and questionable investments, unrelated to the transaction.

Further, it was learned that Natural Resource, GMV, and RVMC performed no contemporaneous financial accounting, and they maintained no meaningful books and records. While Reeser was in charge of the companies' finances, their funds were

readily co-mingled and their various bank accounts were treated as "one big pot" to make payments to each other and to Reeser and his partners, their relations, or companies they controlled.[6] As a result, the finances of these three companies were an "impenetrable web."

Following these revelations, the Glovers amended their complaint to add, among other things, a claim against Reeser and his partners for breach of fiduciary duty based on their self-dealing and impermissible preferential transfers of funds as managers of an insolvent entity. They sought both compensatory and punitive damages.

Following a bench trial, the trial court concluded that Reeser, his partners, Natural Resource, GMV, and RVMC "disregarded the separateness of [the LLCs] by commingling their assets on an interchangeable basis and confusing their otherwise separate properties, records, and control in order to defeat justice and evade contractual and tort responsibility." The court further determined that Reeser and his partners had a fiduciary duty to the Glovers that arose in December 2016, once the

---

[6] In the spring of 2017, Reeser and his business partners separated their various business interests. Reeser's partners continued the practice of co-mingling the companies' funds and bank accounts after parting ways with Reeser.

investment raise into RVMC was completed and generated significantly less money than anticipated, and GMV had to dedicate money to the deal in order to reach the minimum $5 million offering. At that time, GMV's outstanding liabilities exceeded its assets, rendering it insolvent. The court concluded that, during GMV's insolvency, Reeser and his partners "breached their fiduciary duties by diverting funds . . . to the benefit of themselves and other insider entities they controlled, for pursuits unrelated to GMV, . . . and by making speculative investments without proper regard for the outstanding obligation GMV owed to the Glovers[.]"

Accordingly, the trial court awarded the Glovers compensatory damages against Reeser and his partners, jointly and severally, in the amount of $2,219,119.53. The court further awarded punitive damages against Reeser and his partners in an amount of $500,000 each, and awarded the Glovers attorney fees and expenses.

1. Reeser asserts that the trial court erred by denying a motion to dismiss on the ground that the Glovers, as creditors of GMV, lacked standing to bring a direct claim against him for breach of fiduciary duties. Specifically, he argues that the action amounts to one for misappropriation of funds and corporate waste and, therefore, should have been brought as a derivative action. Further, Reeser contends that since

the Glovers were not members of GMV, they were statutorily precluded from bringing the action derivatively.[7] We disagree.

Georgia law has long recognized that managing officers and directors of an insolvent corporation are charged with the duty of conserving and managing the remaining assets of that corporation in trust for its creditors. See *Lowry Banking Co. v. Empire Lumber Co.*, 91 Ga. 624 , 631 (2,3) (17 SE 968) (1893) ("The directors of an insolvent corporation, while it is under their management, hold the position of trustees of its assets for the benefit of its creditors. If they are themselves creditors, they are precluded by their trust from securing to themselves, by their official action, any preference or advantage over other creditors[.]"); see *Tatum v. Leigh*, 136 Ga. 791 (72 SE 236) (1911); *McEwen v. Kelly*, 140 Ga. 720 (3) (79 SE 777) (1913); *Ware v. Rankin*, 97 Ga. App. 837, 838 (2) (104 SE2d 555) (1958). In such a case, the insolvent company's officers and directors "cannot in any manner use their powers for the purpose of obtaining a preference or advantage to themselves." (Citation and

---

[7] See OCGA § 14-11-801 (4) (setting forth conditions that must be met in order for a member of a limited liability company to commence a derivative action, which include that "[t]he plaintiff (A) is a member of the limited liability company at the time of bringing the action, and (B) was a member of the limited liability company at the time of the transaction of which he or she complains . . .").

punctuation omitted.) *Hickman v. Hyzer*, 261 Ga. 38, 40 (2) (401 SE2d 738) (1991); *Ware,* 97 Ga. App. at 837-838 (2). Thus, "the directors of an insolvent corporation, who originally stood in a fiduciary relation to the company, become placed in a fiduciary relation to its creditors." (Citation and punctuation omitted.) *Lowry Banking Co.,* 91 Ga. at 631 (2, 3). "[A]ny scheme or device[,] the purpose of which is to indemnify [the owners, officers, or directors of a corporation] against loss, whether as creditors or as endorsers of notes given by the corporation or otherwise, constitutes legal fraud." *Ware,* 97 Ga. App. at 839 (3). An abuse of this duty gives rise to a cause of action in favor of the creditors against the corporate officers and directors to recover sums improperly paid out by the corporation. See *Hickman*, 261 Ga. at 40 (2); *Ware,* 97 Ga. App. at 837-838 (2); *Hodge v. Howes*, 260 Ga. App. 107, 109-110 (4) (578 SE2d 904) (2003); see also *U.S. Capital Funding VI, Ltd v. Patterson Bankshares, Inc.*, 137 FSupp3d 1340, 1375 (II) (C) (S.D. Ga. 2015).

These same fiduciary duties extend equally to the managing members of an insolvent limited liability company. *See Georgia Commercial Stores, Inc. v. Forsman*, 342 Ga. App. 542, 546 (1) (803 SE2d 805) (2017). Thus, "if a managing member of an insolvent limited liability company breaches his fiduciary duty to the company's

creditors by making an improper preferential transfer of company assets to himself, a creditor may bring an action against the member to set aside the transfer and recover the funds impermissibly paid to that member." Id. at 547 (1).

Relying on Delaware law, Reeser would have us eliminate this cause of action unless the creditor of an insolvent company also happens to be a member of that company. See *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A2d 92, 103 (Del. 2007) (declining to recognize that directors of an insolvent corporation owe direct fiduciary duties to creditors, holding instead that creditors must sue derivatively on behalf of the corporation); *CML V, LLC v. Bax*, 6 A3d 238, 241 (II) (Del. Ch., 2010) (holding the non-member creditor of an insolvent LLC was statutorily precluded from bringing a derivative action).

Unlike Delaware, however, Georgia law does recognize that members of an insolvent company owe a direct fiduciary duty to its creditors, and further that a breach of that duty will give rise to a cause of action. See *Forsman*, 342 Ga. App. at 546 - 547 (1); see also *Tatum*, 136 Ga. 791; *Hickman*, 261 Ga. at 40 (2); *Ware,* 97 Ga. App. at 837-838 (2); *Hodge*, 260 Ga. App. at 109-110 (4). Nothing in our precedent or in the common-law principles on which that precedent is based suggests that the creditor's

11

right of action should be limited as urged by Reeser. See *Tatum*, 136 Ga. 791; *Hickman*, 261 Ga. at 40 (2); *Forsman*, 342 Ga. App. at 546 - 547 (1); see also *Tindall v. H & S Homes, LLC*, No. 5:10-CV-044, 2011 WL 5827227, at *4-5 (II) (M.D. Ga. Nov. 18, 2011) (discussing history of the rule). This is particularly true in a case, such as this one, in which GMV is a single-purpose shell entity beneficially owned by Reeser and his partners, all of whom are parties to this lawsuit, and the record does not otherwise identify any other outstanding GMV creditors. See generally *Premier Residential SE, LLC v. Silverstone Residential, LLC*, 368 Ga. App. 142, 147 (1) (a) (889 SE2d 325) (2023) (recognizing that, even in circumstances when a derivative suit is ordinarily required, "a direct action may nevertheless be proper in the context of a closely held corporation where the circumstances show that the reasons for the general rule requiring a derivative suit do not apply") (citation, punctuation, and emphasis

omitted).[8] Accordingly, the trial court did not err by denying Reeser's motion to dismiss for lack of standing.[9]

2. Reeser further argues that the trial court erred by awarding punitive damages against him in excess of $250,000 without finding that he acted with a specific intent to cause harm. The record belies Reeser's assertion.

The trial court awarded punitive damages pursuant to OCGA § 51-12-5.1, which provides that,

> punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

---

[8] The reasons for requiring derivative suits in the ordinary corporate context are to 1) prevent a multiplicity of lawsuits by shareholders; 2) protect corporate creditors by putting the proceeds of the recovery back into the corporation; 3) protect the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not a party to the suit; and 4) adequately compensate the injured shareholder by increasing the value of his or her shares. See *Thomas v. Dickson*, 250 Ga. 772, 774 (301 SE2d 49) (1983); *Premier Residential SE, LLC,* 368 Ga. App. at 147 (1) (a).

[9] By rejecting Reeser's argument that the Glovers lacked standing to bring a claim for breach of fiduciary duties, we likewise reject his argument that we must vacate the trial court's derivative award of award of punitive damages and attorney fees for the same reason.

13

Id. at (b). As a general rule, such awards must be limited to a maximum amount of $250,000. See id. at (g). Nevertheless, "if it is found that the defendant acted, or failed to act, with the specific intent to cause harm," the punitive damage award need not be so limited. Id. at (f).

In its thorough and detailed order, the trial court explicitly found that certain transfers supporting the Glovers' claims "were made with the actual intent to hinder, delay, or defraud" them. The court then concluded that the Glovers "demonstrated by clear and convincing evidence that [Resser and his partners] demonstrated willful misconduct so as to merit punitive damages under OCGA § 51-12-5.1." These findings were sufficient to support the trial court's statutory award of punitive damages. See OCGA § 51-12-5.1 (f); *Moses v. Pennebaker*, 312 Ga. App. 623, 632–33 (7) (719 SE2d 521) (2011).

*Judgment affirmed. Mercier, C. J., and McFadden, P. J., concur.*